NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MORRELL DOOLEY, | |
| Plaintiff, | CIVIL NO. 04-2276 (GEB) |
| v. | |
| ROCHE LABORATORIES, INC., et al., | MEMORANDUM OPINION |
| Defendants. | |

**BROWN, Chief District Judge**

This matter comes before the Court upon Defendants Roche Laboratories, Inc. and Hoffman Laroche Ltd. (hereinafter "Defendants") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 [Docket Entry # 15]. The action was reassigned to the undersigned on January 19, 2007, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons discussed below, Defendants' Motion for Summary Judgment is granted.

**I.    BACKGROUND**

Plaintiff Morell Dooley (hereinafter "Plaintiff") filed a six count Complaint. Count One alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964; Count Two alleges race discrimination in violation of New Jersey's Law Against Discrimination ("NJLAD" or "LAD"); Count Three alleges age discrimination in violation of The Age Discrimination in Employment Act ("ADEA"); Count Four alleges age discrimination under NJLAD; Count Five alleges retaliation in violation of Title VII; and Count Six alleges retaliation in violation of

NJLAD.

The relevant facts, as set forth in Plaintiff's Complaint and the parties briefs and Rule 56.1 statements are as follows. Plaintiff, an African American woman, born on November 24, 1947, began her employment with Defendants on or about October 10, 1966. (Compl., ¶¶ 2-3). Defendant Roche Laboratories, Inc. is the wholly-owned subsidiary of Defendant Hoffman-LaRoche Ltd. (*Id.*). In or about 1972, Plaintiff became a Sales Representative within Defendants Primary Care Division serving the Northeast Region of the United States. (*Id.* at ¶ 4; Defendants' Statement of Undisputed Material Facts ["Def. Statement"] at ¶ 3). Thereafter, in or about 2001, Plaintiff became an Acute Care Sales Representative within Defendants Primary Care Division serving the Northeast Region of the United States. (*Id.* at ¶ 5; Def. Statement at ¶ 4).

On or about October, 2002, Plaintiff applied for two posted Oncology Specialist positions (one located in Newark, New Jersey and one located in Manhattan, New York) as listed by Defendants. (*Id.* at ¶ 37; Def. Statement at ¶ 5). Plaintiff initially interviewed for the positions by telephone. Ken Skidmore, Oncology Business Manager, conducted the phone interviewed and found that she presented favorable abilities regarding customer relationships, interview preparation, initiative, motivation, and sales experience. (Plt. 56.1 Response, ¶ 13). Thereafter, Plaintiff was brought in to interview a second time. She interviewed once for the two positions, with Skidmore, joined by Bill Conkling, Oncology Specialist Manager. (Def. Statement at ¶ 15). At the time of her interview, Plaintiff had been selling the medications Kytril, Tamiflu, Rocephen, Xenical, Roferon-A and Posicor. (Def. Statement at ¶ 8; Plt. 56.1 Response, ¶ 8). The two drugs sold by Oncology Specialists at the time were Kytril and Xeloda. (Plt. 56.1

Response, ¶ 8).

Plaintiff alleges that during the interview "Mr. Skidmore and Mr. Conkling were noticeably uncomfortable . . ." (Compl. at ¶ 40). Although Plaintiff was promised a quick determination and assessment from Skidmore and Conkling about Plaintiff's interview, she did not hear from them. (*Id.*). On or about October 27, 2002, Plaintiff emailed Skidmore about the Oncology Specialist positions. The next day, October 28, 2002, Skidmore replied to Plaintiff, notifying her that the positions were filled. (*Id.* at ¶ 44). Maria Savino and Alissa Cohen (both female Caucasians in their thirties) were the individuals selected to fill the Oncology Specialist positions. (*Id.* at ¶¶ 43, 45).

Skidmore based his hiring determinations upon what he felt was the necessary skills to be a successful Oncologist Specialist at Roche. Specifically, Skidmore opined that promoting Xeloda required a high level of technical sales ability and the ability to promote it through clinical data. Further, Skidmore determined that oncology products were constantly changing due to developing clinical information. Therefore, clinical data had a significant impact on medical practitioners' utilization of oncology products. (Def. Statement, ¶ 17).

Conkling based his hiring determinations upon what he felt was the necessary skills to be a successful Oncologist Specialist at Roche. Specifically, Conkling opined that a Roche Oncology Specialist needed both a thorough understanding of the oncology market and the ability to promote Xeloda. Conkling further determined that the promotion and sale of Xeloda was dependent upon knowledge of the up-to-date clinical and technical data associated with the product and the nuances between competing products. (Def. Statement, ¶ 18).

Although candidates were not expected to have postgraduate training in oncology or pharmacy (plt. 56.1 response, ¶ 21), Skidmore's decision to hire Cohen was the result of her ability to display strong clinical skills through effective communication, as well as her demonstration of being well prepared for the interview. (Def. Statement, ¶ 21). Conkling's decision to hire Savino was the result of her ability to display a strong clinical background as a nutritionist and her ability to demonstrate an understanding of clinical information and complex products. (*Id.* at ¶ 23).

In or about November, 2002, Plaintiff filed a formal internal complaint to Roche's Human Resources Department, alleging that the "interview process and [Plaintiff's] lack of promotion at Roche was a reflection of race and age discrimination . . ." (Compl. at ¶ 48). On or about February 13, 2003, Plaintiff received a letter from Roche's Human Resources Manager Michele Crocco. The letter acknowledged that "the timing around and how specific feedback was provided to you during and after the interview process could have been handled in a better manner. Both managers acknowledged this, and apologized for any miscommunication or lack of clear communication to you regarding the interview process and final selection of candidates." However, the letter continued that no policies were violated. (*Id.* at ¶ 50). Crocco also offered to and did ultimately assist Plaintiff in revising her resume. Further, Crocco informed Plaintiff that Patricia Giles, the South Jersey District Manager was seeking an Oncology Specialist, and that although the interview process was "far along", Giles had yet to make her final decision. (Def. Statement, ¶¶ 40, 41)[1].

---

[1] Plaintiff disputes that she was warned that the process was "far along".

Plaintiff ultimately applied for the South Jersey Oncology Specialist position, and on or about February 4, 2003, interviewed with Giles and the Oncology Therapeutic Area Development Manager Scott Sarisky. (Compl., ¶ 52). Plaintiff alleges that during the morning of the interview, she learned that the position had already been filled. (*Id.*). Plaintiff nevertheless attended the interview and on February 7, 2003, Giles informed Plaintiff that she did not receive the South Jersey Oncology Specialist position. (Def. Statement, ¶ 55). Instead, Christopher Guidi, a Caucasian male in his twenties, was selected. (Compl. at ¶ 54).

Giles determined that Plaintiff's strengths in customer relations and enthusiasm were not sufficient to overcome her inability to demonstrate an understanding of the oncology market and to provide examples of good business planning. (Def. Statement, ¶ 51). However, Giles determined that Guidi had demonstrated strong clinical knowledge and the ability to show good planning skills as he could articulate objectives and give examples of how he achieved them. (*Id.* at ¶ 50).

Thereafter, in or about September of 2003, Plaintiff applied for an Oncology Specialist position in Newark, New Jersey, which had recently been vacated by Maria Savino. (Compl. at ¶¶ 56, 67). A "few days" after the interview, in or about October, 2003, Plaintiff was notified by Oncology Specialist Manager Bill Conkling that Plaintiff had not been selected for the position. (*Id.* at ¶ 58). The individual selected for the position was Anthony Goodson, an African American male in his thirties. (*Id.* at ¶ 59).

Conkling determined that Goodson displayed a great understanding of the oncology marketplace and the positioning of both Kytril and Xeloda. Further, Conkling assessed Goodson as a good interview. (Def. Statement, ¶ 83). With regards to Plaintiff, Conkling determined that

she did not perform as well during the interview, displaying an inability to articulate the clinical sales messages and attributes of Aloxi, a competitor of Kytril.  Further, Plaintiff was unable to articulate a competency and development plan for 2003, nor was she able to articulate a business development plan or whether she had a written plan of action.  Additionally, Plaintiff was unable to answer questions directly and had to be "re-focused" during the interview.  (*Id.* at ¶¶ 84-87).

On or about June 13, 2003, following her internal complaint to the Roche Human Resource Department, Plaintiff received her first and only written warning for a forged doctor's signature on an order form accepting pharmaceutical samples.  (*Id.* at ¶¶ 72-78; Compl. at ¶ 64).  Plaintiff alleges that she was forced to sign the warning (*id.* at ¶ 65) and that although other sales representatives had also faced similar incidents, they were not given warnings nor threatened with termination.  (*Id.* at ¶ 66).  Since November, 2002, Plaintiff has failed to receive any promotions.  (*Id.* at ¶ 67).

## II.     STANDARD OF REVIEW

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.,* 79 F.3d 1358, 1366 (3d Cir. 1996); *Healy v. New York Like Ins. Co.*, 860 F.2d 1209, 1219, n.3 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098 (1989); *Hersh v. Allen Prod. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no issue for trial exists unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict in its favor). In deciding whether triable issues of fact exist, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

> Rule 56(e) of the Federal Rules of Civil Procedure provides, in relevant part:
>
>> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). The rule does not increase or decrease a party's ultimate burden of proof on a claim. Rather, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255-56.

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided evidence to show that a question of material fact remains. *See Celotex*, 477 U.S. at 324. Put another way, once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, for example, with affidavits, which may be "supplemented . . . by depositions, answers to interrogatories, or further affidavits," id., "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, n.12; *see also Anderson*, 477 U.S. at 247-48 ("[B]y its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion . . . the requirement is

-7-

that there be no *genuine* issue of *material* fact.") (emphasis in original).

What the non-moving party must do is "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *see also Lujan v. National Wildlife Fed.*, 497 U.S. 871, 888 (1990) ("The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); *Anderson*, 477 U.S. at 249; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("To raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant" but rather must exceed the 'mere scintilla' threshold.), *cert. denied*, 507 U.S. 912 (1993).

## III. DISCUSSION

### A. Establishment of Race and Age Discrimination Under Title VII, NJLAD and ADEA

Plaintiff brings claims against Defendants for discrimination based upon race and age under Title VII, NJLAD and ADEA. Discrimination claims brought under Title VII, NJLAD and ADEA must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).[2] The framework consists of three steps. First, a plaintiff must

---

[2] "Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim." *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999). Likewise, analysis of a claim made under ADEA generally follows a slightly modified version of the *McDonnell* test. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997). Therefore, the analysis of Plaintiff's Title VII claim of discrimination on the basis of race and age applies to Plaintiff's identical claims under NJLAD and ADEA.

present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802. If the defendant satisfies this burden, the reviewing court must proceed to the third step. At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendant's articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination." *Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253. A plaintiff will satisfy this burden by providing evidence that would cause a fact finder to disbelieve the reasoning articulated by the defendant or believe that invidious discriminatory reasons were more likely than not a motiving cause of the defendant's actions. *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994). Although the evidentiary burdens shift between the plaintiff and the defendant, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

In *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), the Third Circuit described the type of adverse employment decision that is actionable under Title VII. The adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Id.* (citing and quoting 42 U.S.C. § 2000e-2(a)(1) and (2)).

In order to establish a prima facie case of discrimination in a case of failure to promote, the plaintiff must prove that: 1) she belongs to a protected class; 2) she was qualified for the position; 3) she was rejected despite her qualifications; and 4) after her rejection, a similarly-situated individual from a non-protected class was promoted, or the job remained open and the employer continued to seek applicants from persons with plaintiff's qualifications. *Fuentes* at 763. As established in *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997), "[t]he defendant is entitled to summary judgment if the plaintiff is unable to establish a genuine issue of material fact concerning at least one element of the prima facie case."

Here, Plaintiff alleges that she has successfully satisfied the prongs of her prima facie case of discrimination. Specifically, Plaintiff asserts that the position of Oncology Specialist was a hybrid of the pharmaceutical sales positions Plaintiff had previously held, and that none of the other candidates had sold Xeloda previously. (Plt. Counter-Statement, ¶¶ 41, 60). Plaintiff further asserts that she had prior experience in oncology, evidenced by her attendance at certain tumor board meetings and previous sales experience involving Oncologists. (*Id.* at ¶¶ 47, 52-54, 152-153). Additionally, Plaintiff argues that she received positive performance reviews by Roche in the past, awards for success in sales, significantly more pharmaceutical sales experience than the successful candidates, and that she had extensive knowledge of Kytril, the other pharmaceutical drug sold by the Oncology department at Roche. (*Id.* at ¶¶ 34-36, 47, 52-54, 136, 148, 152-153).[3]

---

[3] Plaintiff asserts that Defendants "concede[s] that Ms. Dooley has established a prima facie case of race discrimination and age discrimination . . ." Defendants, in actuality, state in their moving papers that "[w]ith one exception, Roche will assume, for the purpose of this motion only, that plaintiff can satisfy a prima facie case of race and age discrimination . . ." Regardless of the parties' positions, this Court will consider the merits of Plaintiff's prima facie claims of discrimination.

The Court finds, however, that Plaintiff fails to make a prima facie case of discrimination because she has not satisfied the second prong of her prima facie case for a failure to promote claim.  Plaintiff indeed is a member of two protected classes under Title VII and ADEA, as she is African American and was 54 and 55 years of age respectively at the time of the interviews.  However, Plaintiff fails to demonstrate that she was qualified for the position of Oncology Specialist.  Specifically, although Plaintiff did have clinical knowledge of Kytril, the antiemetic drug sold in the oncology market, she failed to demonstrate knowledge of Xeloda, an oral treatment for breast and colorectal cancers, and Roche's self-proclaimed "primary oncology product." (Def. Brief, p. 13).  Further, it was determined by Roche that the successful sale of Xeloda would rely heavily on clinical knowledge of the drug, as well as a concerted effort by the selected Oncology Specialist to emphasize that clinical knowledge to potential clients during an attempted sale.  (Def. Statement, ¶¶ 17, 18, 46).  However, when Plaintiff was asked during the October 11, 2002 interview whether she sold clinically or by rapport, she herself professed that she sold by rapport.  (Def. Brief, p. 13; Dooley Dep. at 41:21-23).  Also, Plaintiff considered to interview poorly, failing to answer questions directly and clearly.  (Def. Statement, ¶¶ 23, 32, 40, 53-54, 87).  The individuals hired for the then-existing Oncology Specialist positions, on the other hand, each demonstrated good interviewing skills as well as clinical backgrounds.  (Def. Statement, ¶¶ 21, 23, 50, 83).  Therefore, based upon the basic needs of the Oncology department of Roche, Plaintiff lacked the necessary knowledge and sales skill to successful promote and sell Xeloda.

However, assuming *arguendo* that Plaintiff did satisfy all prongs of her prima facie case for failure to promote, the Court concludes that Defendants successfully demonstrate

nondiscriminatory reasons for its actions. Further, the Court concludes that Plaintiff fails to demonstrate that Defendants reasons for its actions are merely a pretext for discrimination.

As previously discussed, when the initial prima facie case for failure to promote discrimination is successfully demonstrated, the burden then shifts to Defendants to show through admissible evidence a nondiscriminatory reason for its actions. *Burdine*, 450 U.S. at 255; *Salkovitz v. Pioneer Electronics (USA), Inc.*, 2005 WL 1638131 at * 4 (D.N.J. 2005). The burden for Defendants is "rather light", and ordinarily, unless silent, a defendant will almost always meet its burden. *Id.* In the case at bar, Defendants assert that Plaintiff failed to interview well and also failed to demonstrated the clinical knowledge and clinical sales ability to adequately market Xeloda. (Def. Brief, pp. 13-14). Conversely, the individuals selected for the Oncology Specialist positions maintained good interview skills and clinical knowledge. (*Id.* at p. 14). Based upon the proffered evidence, this Court concludes that Defendants have articulated nondiscriminatory reasons for its actions in not hiring Plaintiff for the Oncology Specialist positions in question and have satisfied their burden.

Because Defendants have articulated nondiscriminatory reasons for its actions, the burden must again shift to Plaintiff to show that Defendants reasons for its actions are pretextual. To show pretext, Plaintiff must provide evidence that casts doubt on Defendants reasoning and from which "a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes* at 764. In essence, as defined in *Salkovitz*, 2005 WL 1638141 at * 6, a court must determine whether the actual reason for Defendants failure to promote was discriminatory in nature. However, Plaintiff need not

show that age and/or race was the sole basis in a failure to promote situation, but rather, that it was a factor in the decision making process. *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1212 (3d Cir. 1995).

Here, Plaintiff asserts that Defendants proffered reasons for failure to promote are in fact pretextual. (Plf. Brief, pp. 6-9). Specifically, Plaintiff asserts that she was more qualified than those that were hired because of her knowledge of Kytril, because of the high honors she had earned throughout her sales career at Roche, and because of her client base that she had developed over her years of pharmaceutical sales experience . . . experience that Plaintiff contends the successful candidates did not possess. (*Id.*). Further, Plaintiff asserts that she did receive favorable feedback from those with which she interviewed regarding her interviewing style, her client base and the awards and other acknowledgments she had received throughout her career. (*Id.* at p. 9). Additionally, Plaintiff asserts that she detected negative body language by some of her interviewers. (*Id.* at p. 11).

The Court finds, however, that Defendants propounded reasoning regarding Plaintiff's interviewing ability are very different. Defendants assert that overall, Plaintiff was unable to focus on the questions she was asked, and did not interview *as well* as the other candidates. (Def. Brief, pp. 16, 28). These interpretations of the interview process are from the interviewers themselves. (Conkling Cert.; Skidmore Cert.; Giles Cert.). Indeed, "pretext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1993). Further, what interviewers tell interviewees is usually a much more tempered version than what they actually perceive. Plaintiff herself admits that during the

February 2003 South Jersey interview that Giles and Sarisky were looking to have her discuss the DeWitt clinical reprint and that she was incapable of recalling the information. (Dooley Dep. at 93:25 - 94:4).

However, Plaintiff does provide evidence that supports her assertion that she had performed successfully during the interviews. In particular, Plaintiff points to Skidmore's acknowledgment that Plaintiff's telephone interview was good (Plt. Statement, ¶¶ 70-71, 73); that Skidmore told Plaintiff she did very well during the in-person interview and was enthusiastic (Plt. Statement, ¶ 92); that Skidmore told his supervisor, Regional Sales Manager Scott Zimmerman that Plaintiff did well during the interviews (Plt. Statement, ¶ 91); that Conkling praised Plaintiff's preparation for her fourth application for an Oncology Specialist position (Plt. Statement, ¶ 117); and that Giles and Sarisky praised Plaintiff's interview performance as well (Plt. Statement, ¶ 51).

Although a question of fact, the Court finds that this question is immaterial in light of the significant deficit Plaintiff displayed during the interview processes regarding her lack of technical sales ability and knowledge of clinical data. This deficit was underscored during the October, 2002 interviews where Plaintiff herself admitted that she was a rapport salesperson, not a clinical salesperson. (Def. Statement, ¶ 24).

The chosen candidates, however, demonstrated significant levels of clinical knowledge. (Def. Statement, ¶¶ 21, 23, 50). This knowledge was determined to be critical by Defendants, and their choice of candidates so demonstrates. Although Plaintiff had sales experience with Kytril, Defendants' evidentiary support for the need to sell Xeloda clinically is uncontroverted, and would necessarily preclude the promotion of Plaintiff despite her years of sales experience,

-14-

her ability to sell Kytril, her awards and her alleged ability to interview well.

Additionally, although Plaintiff asserts that she detected negative body language from her interviewers, such body language is simply insufficient. *See Burniche v. General Electric Automation Services, Inc.*, 306 F.Supp.2d 233, 243 (N.D.N.Y. 2004) (supervisor's body language insufficient to establish pretext).

Finally, in consideration of Plaintiffs claims of racial discrimination, the Court notes that Defendants did hire an African American for the Newark Oncology Specialist position. (Def. Statement, ¶ 82).

Therefore, the Court concludes that Plaintiff fails to demonstrate that she was qualified for the position of Oncology Specialist. Further, even if Plaintiff had demonstrated that she was qualified, she fails to demonstrate that Defendants proffered reasons for failing to promote Plaintiff were pretextual. As such, the Court finds that Defendants are entitled to judgment as a matter of law.

      **B.**    **Establishment of Retaliation for Complaint of Discrimination**

Plaintiff next contends in her Complaint that Defendants retaliated against her for filing an internal complaint of discrimination with Defendants Human Resources Department. As evidence, Plaintiff points to a written warning she received on August 5, 2003 and to Defendants failure to promote Plaintiff after November, 2002. (Compl., ¶¶ 65, 67).

Similar to discrimination claims, claims of retaliation are subject to a *McDonnell* type analysis. For retaliation claims pursuant to Title VII, NJLAD and ADEA, a plaintiff must establish a prima facie case. To do so, a plaintiff must provide evidence that "(1) she engaged in protected activity; (2) she was subjected to adverse employment action contemporaneous with or

subsequent to the protected activity; and (3) a causal link exists between the protected activity and the adverse employment action."

Again, if a plaintiff satisfies the initial burden, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment action. If the defendant satisfies its burden, the burden shifts again to the plaintiff to show that "retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997). As stated previously, a plaintiff will satisfy this burden by providing evidence that would cause a fact finder to disbelieve the reasoning articulated by the defendant or believe that invidious discriminatory reasons were more likely than not a motiving cause of the defendant's actions. *Fuentes* at 759. However, in a retaliatory failure to promote claim made under NJLAD, there is another level of analysis. In this level, if a plaintiff is able to establish pretext, the final burden shifts back to the defendant to "prove by a preponderance of the evidence that the adverse action would have been taken regardless of retaliatory intent." *McKenna v. Pacific Rail Service*, 32 F.3d 820, 829 n. 7 (3d Cir. 1994).

As evidence of retaliation against her for filing an internal complaint of discrimination with Roche, Plaintiff refers this Court to a written warning she received on August 5, 2003. (Plt. Counter Statement, ¶ 253). The basis of the warning, as alleged by Defendants, was because Plaintiff violated Defendant's Sample Accountability Standard Operating Procedure. (Def. Statement, ¶ 74). Specifically, and as discussed above, Defendants allege that Plaintiff provide pharmaceutical samples without obtaining a doctor's signature. (*Id.*). Further, Defendants assert that no demotion or financial penalty was incurred by Plaintiff because of the written warning.

(*Id.* at ¶ 78).  Plaintiff responds by stating that she only signed the warning because she was told that she would be fired otherwise.  (Plt. Counter Statement, ¶ 259).  Plaintiff further retorts that the punishment was more severe than the action warranted, and that other sales representatives were not similarly investigated and punished for the same conduct.  (*Id.* at ¶ 262).  Plaintiff also asserts that approximately two months after her age and race discrimination complaints were internally filed, two of Plaintiff's prime accounts were removed from her territory.  (*Id.* at ¶ 265).  As additional evidence of retaliation, Plaintiff once again references Roche's failure to promote her to the position of Oncology Specialist

In consideration of Plaintiff's basis for her prima facie case of retaliation, the Court finds that Plaintiff fails once again to satisfy her burden.  First, as Defendants argue, a written warning which does not result in any material change to Plaintiff's employment (pay or status) is insufficient to constitute an adverse employment action.  *See Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001); *Hurley v. Atlantic City Police Department*, 1998 WL 351781 at *12 (D.N.J. 1998).  Because Plaintiff did not suffer any financial or status loss, the written reprimand cannot constitute an adverse employment action and therefore cannot be considered as evidence of retaliation in Plaintiff's prima facie case.

The Court must therefore next consider, as the sole basis of Plaintiff's prima facie case of retaliation, the failure of Plaintiff to obtain the position of Oncology Specialist for which she applied and was denied in February and November 2003.[4]

Regarding the February 2003 interview as conducted by Giles, he himself certifies (without contradicting evidence from Plaintiff) that he was unaware of Plaintiff's internal

---

[4] As Plaintiff did not file her internal complaint to the Roche Human Resources Department until November, 2002, the interviews and denials Plaintiff received on October, 2002 cannot be considered as a basis for retaliation.

-17-

complaint of discrimination at the time he interviewed Plaintiff and hired Guidi. (Giles Cert. at 20). Because Giles was unaware of Plaintiff's internal complaint at the time of the February 2003 interview and hiring of Guidi, it is implausible that the failure to promote was a result of retaliation. *See Bazargani v. Haverford State Hospital*, 90 F.Supp.2d 643, 654 (E.D.Pa. 2000) (connection of retaliation and activity depends on evidence that the decision maker knew of the activity).

Regarding the November 2003 interview, again as Defendants point out, the interval of time between the internal complaint and the interview, almost a full year, is simply to remote to for this Court to find a causal connection. *See Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 760 (3d Cir. 2004); *Woods v. Bentsen*, 889 F.Supp. 179, 187 (E.D.Pa. 1995) ("courts generally hold that if at last four months pass after the protected action without employer reprisal, no inference of causation is created").

Again, assuming *arguendo* that Plaintiff had demonstrated evidence in support of her prima facie case, Defendants articulate legitimate non-retaliatory reasons for its decisions not to promote Plaintiff and Plaintiff fails to offer any evidence to support an assertion that Defendants articulated reasons are pretextual. Therefore, there are no questions of material fact and Defendants are entitled to judgement as a matter of law.

### IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment under Rule 56 is granted.

s/Garrett E. Brown, Jr.<br>
**GARRETT E. BROWN, JR**<br>
**CHIEF UNITED STATES DISTRICT JUDGE**

Dated: February 15, 2007